

**SIGNED this 15th day of April, 2015**

Marcia Phillips Parsons
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

_____

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re | |
|    SHAFI JAMAL KEISLER and | No. 08-34321 |
|    KELLY LYNNE DICKENS, | Chapter 7 |
|             Debtors. | |

MISSION COMPOUND, LLC;
COURMONT & WAPNER ASSOCIATES;
DR. R. GLENN HALL; JOHN BRACKEN;
and JORDAN E. GLAZOV,

       Plaintiffs,

vs.                                                           Adv. Pro. No. 14-3018

SHAFI JAMAL KEISLER,

       Defendant.

## MEMORANDUM

<small>APPEARANCES:</small>

| | |
|---|---|
| James Kelly Giffen, Esq. | Michael H. Fitzpatrick, Esq. |
| Post Office Box 2649 | 800 South Gay St., Suite 2121 |
| Knoxville, Tennessee 37901 | Knoxville, Tennessee 37929 |
| *Attorney for Plaintiffs* | *Attorney for Defendant* |

**Marcia Phillips Parsons, Chief United States Bankruptcy Judge.** In this adversary proceeding, Plaintiffs Mission Compound, LLC, Courmont & Wapner Associates, Dr. R. Glenn Hall, John Bracken, and Jordan E. Glazov seek judgments against Defendant Shafi Jamal Keisler and a determination that their judgments are nondischargable under 11 U.S.C. § 523(a)(2)(A). The Plaintiffs allege that in order to induce loans from them the Defendant fraudulently misrepresented his 100% ownership in certain stock and purported to grant the Plaintiffs a security interest in 100% of the stock when in fact he owned it jointly with his wife, that the Plaintiffs justifiably relied on the Defendant's misrepresentations, and their reliance was the proximate cause of their losses.

Presently before the court are the parties' cross motions for summary judgment. Citing the doctrines of collateral estoppel and res judicata, the Defendant argues that this court's ruling in an earlier adversary proceeding that the Plaintiffs were in fact secured by the stock notwithstanding the Defendant's misstatement of ownership precludes their fraud claim, because the Plaintiffs will be unable to establish justifiable reliance or proximate cause. The Plaintiffs disagree and in their own motion for partial summary judgment argue that the undisputed facts establish their § 523(a)(2)(A) fraud claim as a matter of law. For the reasons discussed hereafter, the court concludes that summary judgment in favor of the Defendant is appropriate. This is a core proceeding. *See* 28 U.S.C. 157(b)(2)(I).

I.

Shafi Keisler and his wife Kelly Dickens filed a voluntary petition for bankruptcy relief under chapter 11 of the Bankruptcy Code on September 29, 2008. As debtors in possession, they proposed an initial and then later amended plan of reorganization in which they represented that they jointly owned 100% of the stock of Keisler Engineering, Inc. as tenants by the entirety, and that the security interests of Plaintiffs and other lenders in the stock, with the exception of Plaintiff Mission Compound, was limited to Mr. Keisler's survivorship interest. This contention was based on the fact that the security agreements pledging the stock had been executed solely by Mr. Keisler, except the security agreement as to Mission Compound, which had been signed by both Mr. Keisler and Ms. Dickens. In furtherance of this position, Mr. Keisler and Ms. Dickens commenced an adversary proceeding against the Plaintiffs and other lenders claiming security interests in the Keisler

2

Engineering stock, requesting that the court determine the nature, extent and value of the lenders' security interests in the stock pursuant to 11 U.S.C. § 506 (the "§ 506 Adversary Proceeding").[1]  The Plaintiffs strenuously defended the adversary proceeding and adamantly opposed plan confirmation.

After a four-day trial in the § 506 Adversary Proceeding, this court, speaking through Judge Richard S. Stair, issued a memorandum opinion on November 4, 2010.  In his characteristically thorough fashion, Judge Stair concluded that it was inconsequential that Ms. Dickens had not executed security agreements for all of the lenders, as she had pledged her interest in the stock to all of the lenders when she had executed certain note agreements with the lenders.  Accordingly, the court entered judgment on June 27, 2011, determining that all of the lenders had a security interest in both Mr. Keisler and Ms. Dickens' interests in the Keisler Engineering stock, and fixing the amounts of the various respective claims as the parties had stipulated.

Mr. Keisler and Ms. Dickens' bankruptcy case was converted from chapter 11 to chapter 7 on January 16, 2014, without a plan of reorganization being confirmed.  On April 18, 2014, the Plaintiffs commenced this adversary proceeding, alleging that in order to induce loans from the Plaintiffs to the Defendant's company American Gear & Transmission, Inc., which loans were individually guaranteed by the Defendant and his wife, the Defendant represented  that he owned 100% of the Keisler Engineering stock, that no one besides him had any interest in the stock, and that he would protect and defend the security interest from all claims.  The Plaintiffs asserted that contrary to these representations, the Defendant subsequently claimed in his original and amended reorganization plans and in the § 506 Adversary Proceeding that he did not own 100% of the Keisler Engineering stock and that his wife's interest had never been pledged to any of the Plaintiffs other than Mission Compound.    The Plaintiffs allege that they relied on the Defendant's misrepresentations when loaning American Gear sums totaling $1,497,000 on May 16, 2006, and that their reliance was the proximate cause of their damages.  The Plaintiffs seek nondischargeable

---

[1] The § 506 Adversary Proceeding was styled *Shafi Jamal Keisler and Kelly Lynne Dickens v. Mission Compound, LLC, Courmont & Wapner Associates, LLC, Dr. R. Glenn Hall, Fundacion Galvez, James Hall, John Bracken, Jordan and Sheila Glazov, The Kenneth & Ellen Nibali Trust, Clifford Johnson, Donald Tarr, Edward Drummond, George Kershaw, Joe Brownelee, Jr., John Kerr, Phillip Young, and Tom Raymond* and assigned no. 09-3076.

judgments under 11 U.S.C. § 523(a)(2)(A) for the loan balances and their costs of collection, including their expenses in opposing the Defendant's reorganization plans and defending the § 506 Adversary Proceeding.

In the Defendant's motion for summary judgment as supplemented that is presently before the court, he argues that the court's judgment in the § 506 Adversary Proceeding bars the Plaintiffs' claims in this action on grounds of collateral estoppel and res judicata. Specifically as to collateral estoppel, the Defendant argues that the court's ruling disproves § 523(a)(2)(A)'s required elements of justifiable reliance and proximate cause. And alternatively as to res judicata, the Defendant argues that the Plaintiffs could have asserted their nondischargeability claim in the context of the § 506 Adversary Proceeding and the claim is now barred because they failed to do so.

In the Plaintiffs' motion for partial summary judgment, they assert that the undisputed facts entitle them to judgment as a matter of law on every element of their § 523(a)(2) claim.[2] Each side has filed responses to the other's motion along with memoranda of law and statements of undisputed material facts and responses to statements. Additionally, affidavits have been submitted from the Defendant; Plaintiffs Jordan Glazov, John Bracken and Dr. R. Glenn Hall; Raymond Wapner, a general partner of Plaintiff Courmont & Wapner Associates; Shusheel Kurien, manager of Plaintiff Mission Compound; and Marilyn Lord-James, one of the attorneys that represented Mission Compound. As the filings indicate, the following pertinent facts are not disputed for the purposes of summary judgment.

II.

Keisler Engineering was incorporated on December 22, 2003, and on that same date, issued a single share certificate in the amount of 100 shares jointly to Mr. Keisler and Ms. Dickens. Mr. Keisler has served as president and chief executive officer of the company since its inception. Its business consists primarily of the modification and resale of after-market automobile engines and transmissions.

---

[2] The Plaintiffs' motion reserves for trial the amount of damages to be awarded and only seeks summary judgment on the nondischargeability of those damages.

In 2005 Mr. Keisler learned of the closing of a General Motors/Chrysler joint venture manufacturing plant and of the planned liquidation of the plant's equipment by Maynards Industries (1991) Inc. On March 14, 2006, Keisler Engineering entered into an agreement with Maynards to purchase a portion of the equipment for a sum in excess of $5 million, intending to use the equipment to open a manual transmissions manufacturing facility in East Tennessee, and paying a non-refundable deposit of ten percent of the purchase price. To facilitate the endeavor, Mr. Keisler incorporated American Gear, serving as its president and chief executive officer, and was its sole shareholder, holding 1,000 shares of stock. After its incorporation, American Gear was assigned Keisler Engineering's interest in the purchase agreement with Maynards.

The initial deadline for the closing of the equipment purchase was April 17, 2006. Shortly before this deadline, BB&T issued a commitment letter to American Gear for a credit line of $3,450,000 but required the company to obtain $6.6 million of subordinate financing or equity. To obtain the remaining funds, Keisler Engineering and American Gear entered into a consulting agreement with Jordan Glazov on April 13, 2006, and an engagement agreement with Marco Polo Securities, Inc. on April 14, 2006.

After the closing was extended several times, a final deadline was set for Tuesday, May 16, 2006. Realizing that he could not purchase the entire line of equipment, Mr. Keisler negotiated with Maynards to purchase a lesser amount of the equipment for $3,823,700. On May 10, 2006, BB&T issued a revised commitment letter to American Gear for a $2,950,000 line of credit that was further revised on May 13, 2006. Through the efforts of Marco Polo Securities, Mr. Glazov and Mr. Keisler, American Gear received verbal commitments for subordinate loans from Plaintiffs as follows: $500,000 each from Mission Compound and Courmont & Wapner Associates, $240,000 from John Bracken, $100,000 from Dr. R. Glenn Hall, and $157,000 from Mr. Glazov.

With the exception of Mission Compound, none of the Plaintiffs were represented by counsel during the negotiations,[3] although Plaintiffs John Bracken and Jordan Glazov were licensed

---

[3] Dr. Hall brought in his attorney, Michael O'Mara, on the morning of May 15, 2006, to ensure that all loan documents were executed before funds were released from escrow, but Mr. O'Mara did not participate in any of the loan negotiations.

(continued...)

attorneys.  Plaintiff Mission Compound was represented by the New York law firm of Saviano, P.C., primarily through Edward Saviano, and American Gear was represented by the Atlanta law firm of McKenna, Long, & Aldridge, LLP, primarily through Luis Aguilar and James Ludlam.

To meet the May 16, 2006 closing deadline, the documents for the loans were initially drafted by Mr. Saviano on behalf of Mission Compound, and then revised in a number of emails sent back and forth between and among Mr. Keisler, Mr. Glazov, Mr. Saviano, Mr. Aguilar and others from Friday, May 12, through Monday, May 15, 2006.  In one such email sent by Mr. Keisler to Mr. Glazov and Mr. Ludlam at 2:34 a.m. on May 15, 2006, Mr. Keisler noted his comments and concerns on the draft documents, and filled in blanks left in the draft security agreements by inserting "100" as the percentage of Keisler Engineering stock and American Gear stock owned by him.  As to Keisler Engineering, the percentage of ownership was an error because Mr. Keisler jointly owned the stock with his wife.

The closing for the BB&T loan occurred on Monday, May 15, 2006, and the closing for the subordinate loans from the Plaintiffs occurred the next day on May 16, 2006.  Both closings were conducted by BB&T attorney Justin Martin at his office in Maryville, Tennessee.  None of the Plaintiffs attended the closings, nor any attorney on their behalf, although Mr. Martin was in touch by telephone during the closing with Mr. Saviano, the attorney for Plaintiff Mission Compound.

At the May 15, 2006 closing, Mr. Keisler, as CEO and president of American Gear, executed a loan agreement with BB&T, a promissory note in favor of BB&T in the amount of $2,950,000, and a security agreement granting BB&T a security interest in all of American Gear's assets.  Mr. Keisler  also pledged his interest in American Gear as additional security for the debt and both Mr. Keisler and Ms. Dickens individually signed personal guaranties, as did Mr. Keisler on behalf of Keisler Engineering.

Similarly at the May 16, 2006 closing, Mr. Keisler in his capacity as president of American Gear executed note agreements, promissory notes in favor of each of the Plaintiffs, and security agreements granting the Plaintiffs security interests in American Gear's assets behind BB&T.  The

[3](...continued)

note agreements, as well as guaranties, were also signed by Mr. Keisler and Ms. Dickens individually.  Lastly, Mr. Keisler signed security agreements granting the Plaintiffs a security interest in 100% of the Keisler Engineering stock.  The security agreements recited that Mr. Keisler "owns [100] shares of [Keisler] Engineering common stock representing One Hundred (100%) percent of the issued and outstanding stock of [Keisler] Engineering," that "no one besides [Mr. Keisler] owns or has any interest in or claim against the Security," and that Mr. Keisler will, at his "sole cost and expense protect and defend the Security from any and all claims . . . ."

During the May 16 loan closing, Mr. Martin asked to see the American Gear and Keisler Engineering share certificates.  Until this point, no one had asked to see the Keisler Engineering share certificate.  The Defendant did not have the share certificates with him at closing, but at Mr. Martin's request he left the closing and obtained the original certificates from his office.  When Mr. Keisler presented the share certificates to Mr. Martin, the latter pointed out that the Keisler Engineering shares listed both Mr. Keisler and his wife as owners and that consequentially the security agreements representing Mr. Keisler as the sole owner of the stock were erroneous.  Mr. Keisler was not aware of the error until it was pointed out by Mr. Martin.

After discovering the error in the security agreements, Mr. Martin telephoned Mr. Saviano from the closing and told him that he had possession of the Keisler Engineering share certificate which evidenced that the stock was actually owned by both Mr. Keisler and his wife.  To facilitate the closing, Mr. Keisler and Ms. Dickens executed a blank stock power for the Keisler Engineering share certificate, and Mr. Keisler also signed a blank stock power for his American Gear share certificate. Mr. Martin then sent the blank stock powers, along with the respective share certificates, via Federal Express to Mr. Saviano.  The parties authorized escrow agent Tennessee Valley Title to release the loan funds, and it wired $3,130,000 to Maynards to complete the purchase.  Mr. Saviano represented no party other than Plaintiff Mission Compound, and he never communicated anything he learned during the closing about the Keisler Engineering share certificate to the other Plaintiffs.  Before their respective funds were released from escrow at the May 16, 2006 closing, none of the Plaintiffs other than Mission Compound through its attorney had seen a copy of the Keisler Engineering share certificate.  If the Plaintiffs had harbored any suspicion that the

7

representations and warranties in the security agreements were not true, they would not have made the loans to American Gear.

On May 17, 2006, Mr. Saviano received the blank stock powers and share certificates that had been sent to him by Mr. Martin.  That same day, Mr. Saviano sent to Mr. Ludlam by email attachment a draft security agreement dated May 16, 2006, granting a security interest in the Keisler Engineering stock for execution by Ms. Dickens in favor of Mission Compound.  On an unspecified date, Ms. Dickens executed the document, which was then received by Mr. Saviano on June 7, 2006. In contrast to the Keisler Engineering security agreements signed by Mr. Keisler only, this security agreement recited that Mr. Keisler and Ms. Dickens jointly owned 100 shares of the Keisler Engineering common stock representing 100% of its issued and outstanding stock.  After  the closing, Mr. Saviano remained in possession of the Keisler Engineering share certificate.

On September 1, 2006,  American Gear sent Side Letter Agreements authored by Mr. Keisler and referencing the prior loans to each of the six subordinate lenders including the Plaintiffs.  The letter agreements stated that the word "shares" as used in the Keisler Engineering security agreements was defined to include all of the shares of stock in Keisler Engineering or American Gear whether owned individually or jointly with Ms. Dickens, and authorized American Gear to enter into additional loans with other lenders for up to $2.5 million using the same collateral. Similarly, in a subsequent letter dated November 27, 2006, from Mr. Keisler to all of the Plaintiffs except Courmont & Wapner Associates and John Bracken regarding a merger of Keisler Engineering with American Gear, Mr. Keisler again stated that Keisler Engineering was owned by him and his wife and that the Keisler Engineering share certificate was being held by Mission Compound as the lead lender on behalf of all of the holders of the notes pursuant to the loan agreements and related security agreements that he and his wife had executed.  Thereafter, American Gear obtained a number of additional loans pursuant to the Side Letter Agreements but was never able to raise sufficient capital to become operational, and never merged with Keisler Engineering. On October 30, 2007, American Gear liquidated at auction the equipment that it had purchased, resulting in proceeds of $3,631,820 that were sufficient to pay the BB&T loan in full and make a pro rata payment to each of the subordinate lenders including the Plaintiffs.

8

As set forth in Judge Stair's memorandum opinion, the issues decided in the § 506 Adversary Proceeding were the amount of each subordinate lender's claim and whether the subordinate lenders other than Mission Compound had a security interest in Ms. Dickens' ownership interest in Keisler Engineering. As to the former issue, the parties stipulated at trial the amounts of the loan balances owed to the Plaintiffs as of the date of Mr. Keisler and Ms. Dickens' bankruptcy filing and these amounts are set forth in the agreed final judgment entered June 27, 2011, in that adversary proceeding: $582,270.04 to Mission Compound; $582,270.04 to Courmont & Wapner Associates; $116,466.80 to Dr. R. Glenn Hall; $279,480.75 to John Bracken; and $182,661.49 to Jordan Glazov.

As to the second issue, whether subordinate lenders other than Mission Compound had a security interest in Ms. Dickens' ownership interest in Keisler Engineering, the court concluded that all did as previously noted. More specifically, the court observed that "each Note Agreement, which details the essence of the parties' relationships and was executed by both [Mr. Keisler and Ms. Dickens] as Pledgers," included the following covenant:

> The Pledgers also hereby . . . grant a security interest and lien in all their shares of stock in the Borrower and in Keisler Engineering and AGT . . . . The Pledgers acknowledge that they will have to give physical possession of this collateral to the Lender, which the Lender shall hold in escrow pursuant to the Security Agreement so that the Lender's security interest is perfected. . . .

The court found that this covenant "state[d] the bargain of the parties and provide[d] for an interest in the shares of stock of Keisler Engineering to secure payment of the respective Promissory Notes issued to all [the Plaintiffs herein]." The court concluded:

> This covenant supports the testimony of the [Plaintiffs herein], Mr. Ludlam, and Mr. Saviano that it was the parties' intentions that both [Mr. Keisler and Ms. Dickens] would pledge any interest held in the stock of American Gear & Transmission and Keisler Engineering as collateral to secure the Promissory Notes executed in favor of the [Plaintiffs herein]. As such, it was not necessary that Ms. Dickens execute the Security Agreement with Mission Compound, and it is inconsequential that she did not sign separate documents entitled "Security Agreement" for the remaining fifteen subordinated lenders because she granted a security interest in her interest in the shares of Keisler Engineering stock in the sixteen Note Agreements.

Judge Stair also addressed certain *pari passu* language in the documents. Both the note agreements and security agreements provided that the security interests conveyed to each of the subordinate lenders were "*pari passu* and equal in priority," and that the security agreements

9

provided that "Mission Compound, LLC will be the lead lender of all the persons providing Secondary Financing" and "shall have the first right to assert the rights of all the persons making loans of the Secondary Financing . . . ." The court concluded that by agreeing to *pari passu* treatment, the parties ensured that the subordinate lenders would be similarly situated. The court further concluded that the post-closing possession of the Keisler Engineering share certificate by Mission Compound through its attorney Mr. Saviano, was "for the benefit of all the subordinate lenders" in Mission Compound's "capacity and role as lead lender." The parties' July 27, 2011 agreed final judgment incorporated these conclusions, and further states that the "*pari passu* security interest shared among the sixteen *pari passu* lenders was and is perfected by the possession of the [Keisler Engineering] Shares by Mission Compound in its role and capacity as the lead lender for the benefit of all sixteen of the *pari passu* lenders."

III.

Under § 523(a)(2)(A), an individual is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by false pretenses, a false representation, or actual fraud . . . [.]" 11 U.S.C. § 523(a)(2)(A). The court construes § 523(a) liberally in favor of a debtor and strictly against a creditor, who bears the burden of proving the necessary elements by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654 (1991); *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). In order to satisfy the requirements of § 523(a)(2)(A), the Plaintiffs must prove that the Defendant obtained money, property, or services through material misrepresentations that he knew were false or he made with gross recklessness, that the Defendant intended to deceive the Plaintiffs, that the Plaintiffs justifiably relied on the Defendant's false representations, and that the Plaintiffs' reliance was the proximate cause of their losses. *See In re Rembert,* 141 F.3d at 280-81.

"False representations and pretenses encompass statements that falsely purport to depict current or past facts." *Peoples Sec. Fin. Co. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983). "As applied to § 523(a)(2)(A), 'the concept of misrepresentation includes a false representation as to one's intention, such as a promise to act.'" *Haney v. Copeland (In re Copeland)*,

291 B.R. 740, 763 (Bankr. E.D. Tenn. 2003)  (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997)).  Under Sixth Circuit authority, a subjective standard determines intent.  *See In re Rembert*,  141 F.3d at 281.  In essence, for a court to make a determination of nondischargeability under § 523(a)(2)(A), a creditor must prove fraud in the inducement, and as such, a determination of nondischargeability often comes down to a debtor's conduct prior to, at the time of, and subsequent to the representations at issue, and which witnesses are the most credible.  *See In re Copeland*, 291 B.R. at 766; *Commercial Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001).

To prove justifiable reliance, a creditor seeking a determination of nondischargeability must show that it actually relied on the representations and based upon the facts and circumstances known at the time that its reliance was justifiable.  *See McDonald v. Morgan (In re Morgan)*, 415 B.R. 644, 649 (Bankr. E.D. Tenn. 2009).  "Under this standard, a creditor will be found to have justifiably relied on a representation even though he might have ascertained the falsity of the representation had he made an investigation." *In re Copeland*, 291 B.R. at 767 (internal quotation marks omitted).  The court must also find that the creditor's reliance on the misrepresentation was the proximate cause of the creditor's loss, which "depends 'on whether the debtor's conduct has been so significant and important a cause that the debtor should be legally responsible.'"  *Id.* (quoting *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991)).

In this case, the Plaintiffs allege in their amended complaint that the Defendant represented and warranted in the security agreements that he owned and was pledging 100% of the Keisler Engineering stock and:

> that he has good and marketable title to the Shares; free and clear of any and all liens and encumbrances and that no one besides [him] owns or has any interest in or claim against the Security . . . [; and he will] at [his] sole cost and expense protect and defend the Security from any and all claims . . . .

The Plaintiffs allege that contrary to these representations, the Defendant had never owned more than a tenants by the entirety interest, and that he compounded his misrepresentations by filing his proposed  reorganization plans and the § 506 Adversary Proceeding in which he challenged the scope of Plaintiffs' security interests in contravention of his promise to defend their interests.  The Plaintiffs contend that the Defendant's misrepresentations were the proximate cause of their losses,

11

which consists not only of the loan balances totaling $1,743,149.12 as stipulated and default interest on these balances at 21%, but also costs of collection in the form of professional fees and expenses totaling $432,625.44[4] in opposing the reorganization plans and defending the § 506 Adversary Proceeding, which collection costs are recoverable under the terms of their loan agreements with the Defendant. According to the Plaintiffs, all of the facts necessary to establish these contentions and the nondischargeability of the amounts owed are established by the stipulated facts, as well as Judge Stair's memorandum opinion, the Defendant's answer to the complaint and the parties' declarations filed in support of the summary judgment motions.

In response, the Defendant similarly points to this same evidence but reaches the opposite conclusion. According to the Defendant, because Judge Stair found that the Plaintiffs' claims were secured by both his and his wife's ownership interest in the Keisler Engineering stock, the Plaintiffs are collaterally estopped from asserting that the misrepresentations regarding ownership of the stock proximately caused their economic injury and damages. Similarly, the Defendant argues that the record does not establish justifiable reliance. He points to the undisputed fact that Plaintiff Mission Compound through its attorney Mr. Saviano knew that the stock was owned jointly before the loans were funded. Because Mission Compound was the lead lender for all of the subordinate lenders including the Plaintiffs, the Defendant argues that its knowledge of the true ownership of the stock should be imputed to all of the Plaintiffs, such that they could not have justifiably relied on the misstatement of ownership in the security agreements. The Defendant also points out that one of the stipulations in the prior adversary was that Plaintiff Jordan Glazov knew of Ms. Dickens' interest in the stock such that there was no reliance by him on any misstatement.

In response to the Defendant's contentions, the Plaintiffs do not dispute that collateral estoppel applies to the extent that issues were resolved previously. But the Plaintiffs maintain that the § 506 Adversary Proceeding only resolved the question of their lien interest and did not resolve this dischargeability action's fraud claim. The Plaintiffs concede that Judge Stair addressed the

---

[4] This figure includes the following collective sums the Plaintiffs have paid for attorney's fees and expenses, valuation expert fees and court reporters: Mission Compound $140,960.44; Courmont & Wapner Associates $166,812.44; Dr. R. Glenn Hall $26,224.84; John Bracken $76,169.96; and Jordan Glazov $22,457.76.

question of stock ownership, but point out that the misrepresentations for which they seek relief also include the Defendant's promise to protect and defend their security interests, which they allege he breached by his reorganization attempts and prosecuting the prior adversary proceeding. As to the issue of justifiable reliance, the Plaintiffs deny that Mission Compound or Mr. Saviano was their agent such that their knowledge should be imputed to them. The Plaintiffs note that none of them other than Mission Compound saw a copy of the Keisler Engineering share certificate before releasing their loan proceeds, that Mr. Saviano represented only Mission Compound in the transaction, and that he never communicated anything he learned during the closing about the Keisler Engineering share certificate to the other Plaintiffs.

"The doctrine of collateral estoppel 'precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action.'" *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 461 (6th Cir. 1999) (quoting *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 480 (6th Cir.1992) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332 n.23, 99 S. Ct. 645 (1979) ("[T]he whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed.")). As explained by the Sixth Circuit Court of Appeals in concluding that collateral estoppel applies in bankruptcy dischargeability determinations, "[t]hat Congress intended the bankruptcy court to determine the final result dischargeability or not does not require the bankruptcy court to redetermine all the underlying facts." *Spilman v. Harley*, 656 F.2d 224, 227 (6th Cir. 1981).

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891, 128 S. Ct. 2161 (2008). The Sixth Circuit has explained that federal collateral estoppel will apply when:

> (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation,
>
> (2) the issue was actually litigated and decided in the prior action,
>
> (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation,
>
> (4) the party to be estopped was a party to the prior litigation (or in privity with such a party), and

13

(5) the party to be estopped had a full and fair opportunity to litigate the issue.

*Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir.2005).

Comparing the issues in this nondischargeability action with the issues resolved in the § 506 Adversary Proceeding, the court concludes that the Plaintiffs are collaterally estopped from asserting that the loan balances owed them were proximately caused by the Defendant's alleged misrepresentations or the Plaintiffs' reliance thereon. According to the October 21, 2009 pretrial order, at issue in the § 506 Adversary Proceeding was "the determination of the nature, extent and value of the secured claims of each of the [Plaintiffs herein] in the stock ownership of Keisler Engineering, Inc." Judge Stair resolved this issue by concluding that the Plaintiffs' claims were secured by 100% of the stock of Keisler Engineering because both the Defendant and his wife had pledged their interest in the stock to the Plaintiffs in the note agreements. Thus, regardless of the truth of Defendant's representations in the security agreements, the Plaintiffs received exactly what they bargained for with Defendant, a 100% lien on the Keisler Engineering shares. This conclusion is confirmed by Mr. Glazov's testimony at trial that it was irrelevant who actually owned the stock interests, as long as the subordinate lenders received a pledge against 100% percent of the stock. And even assuming that the Defendant's representations were false and that the Plaintiffs relied on these representations, there is no cause and effect relationship with the loan balances owed to the Plaintiffs. The balances remain unpaid because American Gear failed and Plaintiffs' collateral was of insufficient value to make them whole, not because of any false statements by the Defendant.

This conclusion applies not only to the loan balances, but also to the collection costs in the form of Plaintiffs' expenses in opposing the Defendant's reorganization plans and defending the § 506 Adversary Proceeding. If the alleged misrepresentations were not the proximate cause of the loans not being paid, neither can the costs of collection be said to have been caused by the misrepresentations. These costs were not "obtained, by false pretenses, a false representation, or actual fraud" under § 523(a)(2)(A) and thus are not independent damages excepted from discharge, without regard to the dischargeability of the underlying debt. To hold otherwise would be tantamount to concluding that interest on a debt is nondischargeable when the debt itself is not. The

14

Plaintiffs' efforts to characterize their expenses in the bankruptcy case as a separate element of damages flowing from the breach of the promise to protect and defend must be rejected.[5]

Because Plaintiffs are collaterally estopped from asserting that the Defendant's misrepresentations proximately caused their damages, the Defendant must be granted summary judgment since proximate cause is a required element of § 523(a)(2). Thus, it is unnecessary to also address whether the Plaintiffs are collaterally estopped from asserting that they justifiably relied on the Defendant's misrepresentations, another required element of nondischargeability under § 523(a)(2). The court, however, will comment on the Defendant's contention that the true ownership of the stock as known by Mission Compound's attorney Mr. Saviano should be imputed to all of the Plaintiffs because Mission Compound acted as lead lender for the benefit of all subordinate lenders. The issue of whether Mission Compound was an agent of the other lenders for all purposes of the loan transaction, such that its knowledge may be attributed to the others under agency law, was not at issue in the prior adversary proceeding such that collateral estoppel would preclude its litigation in this action. The court's conclusions in the § 506 Adversary Proceeding were for the purpose of determining the extent of the Plaintiffs' security interest, not agency for knowledge or notice purposes.[6] Nor can any general agency status be drawn from the lenders' *pari passu* relationship

---

[5] Although not sought in their amended complaint, the Plaintiffs' memoranda complain that the Defendant and his wife consumed substantial assets of the bankruptcy estate by challenging the Plaintiffs' security interests in their reorganization plans and the § 506 Adversary Proceeding. The Plaintiffs note that the court has approved attorney fees and expenses of $168,255 for representing the Defendant and this wife in the chapter 11 phase of the bankruptcy case. The Plaintiffs fail to explain how these facts support their fraud claim against the Defendant, or under what theory the Plaintiffs may recover these sums.

[6] The court made several statements suggesting that Mission Compound was acting as the agent for the other lenders, such that arguably its knowledge as agent would be imputed to the others as is typical of a principal/agent relationship, even though agency was not at issue. For instance, the court noted that the subordinate lenders "clearly interpreted the term 'lead lender' as authorizing Mission Compound to act as their agent with respect to the American Gear & Transmission loans," that Mr. Goldman testified that Plaintiff "Courmont & Wapner relied on Mission Compound, as lead lender, to file any necessary documents to protect the rights of all the subordinate lenders," and that "Mr. Glazov testified that Mission Compound was the lead lender and fiduciary for all of the subordinate lenders, having the first right to pursue remedies for default and the responsibility to hold the stock certificates for all of their benefit."

as previously examined and found by the court,[7] which deals solely with preference among creditors. As defined by Black's Law Dictionary, *pari passu* means "[b]y an equal progress; equably; ratably; without preference. Used especially of creditors who, in marshaling assets, are entitled to receive out of the same fund without any precedence over each other." *Black's Law Dictionary* 1115 (6th ed. 1994). This court has found nothing to suggest that a party can be deemed to have knowledge of something simply because he stands in *pari passu* with another party that has knowledge, and the Defendant has offered no further support for this assertion. Of course, these conclusions would not apply to Mission Compound. It would be precluded from claiming that it was justified in relying on Defendant's representation and pledge of sole ownership of the Keisler Engineering stock, since its attorney Edward Saviano knew of the true status of ownership prior to the loan proceeds being released.

Because the Plaintiffs are collaterally estopped from asserting proximate causation of their damages, summary judgment in favor of the Defendant is required, and it is not necessary for this court to independently consider the evidence in support of the Plaintiffs' fraud claim. Nonetheless, a careful review of the entire record firmly convinces this court that even if collateral estoppel were inapplicable, summary judgment in favor of the Defendant would be appropriate. Contrary to the Plaintiffs' argument that the undisputed record proves all of the elements for nondischargeability under § 523(a)(2)(A) as a matter of law, a careful review of the record establishes the opposite.

First, there is simply no evidence in the record to support the assertion that *at the time the loans in question were made* the defendant, knowingly or with gross recklessness, lied about his ownership interest in the Keisler Engineering stock and his intention to protect and defend the Plaintiffs' security interest in the stock. To the contrary, the Plaintiffs do not dispute that the

---

[7] The court also likened the subordinate lenders' *pari passu* relationship to a "syndication loan relationship, wherein 'multiple lenders loan money to the borrower and each lender has a contractual arrangement with the borrower. By contractual agreement among the lenders, one lender is designated as agent for all the lenders. The agent then has the authority to act in a representative capacity for all the lenders." Lastly, the court recognized that the lenders had no separate inter-lender agreement concerning Mission Compound's duties and responsibilities as lead leader, but observed that the note agreements acknowledged Mission Compound's lead lender status, which was consistent with the lenders' intentions.

misstatement of ownership in the security agreements was an error that the Defendant did not realize until it was pointed out by Mr. Martin at the closing. The Plaintiffs also do not dispute the Defendant's verified statements that he was not an attorney, that he did not have an attorney present at the closing, that "he did not know how to reconcile the deal requirements to the documents during the closing on May 16, 2006 once the Keisler Engineering stock ownership discrepancy was discovered" and that "he relied upon the attorneys involved to reconcile the issue."  Despite these accepted facts, the Plaintiffs argue that the ownership misstatement, along with the Defendant's subsequent challenge of the Plaintiffs' security interest in his reorganization plans and the § 506 Adversary Proceeding, somehow prove that he had no intention all along to protect the Plaintiffs' security interest.  But if the ownership misstatement is explained away, as it has been done in this case by the parties' undisputed statements, then all that is left to establish original fraudulent intent is the Defendant's breach of the promise to protect and defend.  This breach alone is insufficient. It is well established that:

> [A] broken promise to repay a debt, without more, will not sustain a cause of action under § 523(a)(2)(A).  Instead, central to the concept of fraud is the existence of scienter which, for the purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation.

*EDM Machine Sales, Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003) (citations omitted).  Although this quotation refers to a broken promise to pay, it applies equally to a broken promise to protect a creditor's security interest. Absent evidence from which it may be inferred that there was no intent at the time of the loan to keep the promise, there is no fraud.

Any such evidence of fraudulent intent is totally lacking in this case.  The record demonstrates that the loan documents were prepared in a rush in the hours before the closing, with negotiations still continuing and new terms and lenders entering the picture up until the last minute. The Defendant filled out the blanks in the security agreement listing his ownership in Keisler Engineering stock at 100%, the same as his stock ownership in American Gear, between 1:00 a.m and 3:00 a.m. on May 15, and sent the email to Mr. Glazov and Mr. Ludlam at 2:34 a.m. that morning.  The timing of the error and his 100% ownership interest in American Gear stock suggests that the error regarding the Keisler Engineering stock arose from confusion or a faulty memory in

17

the midst of a time crunch, rather than intentionally as the Plaintiffs do not dispute. The Defendant readily produced the Keisler Engineering share certificate when requested before the loan was closed, and there is no indication that he sought to hide the true ownership of the stock or failed to cooperate when the error was discovered. To the contrary, the Defendant and his wife both signed blank stock powers for the Keisler Engineering stock that were forwarded to Mr. Saviano and the Defendant's wife executed the new security agreement sent to her after the closing. The note agreements executed by the Defendant at the same time as the security agreements recognized that both the Defendant and his wife were granting a security interest in their Keisler Engineering stock, and the Defendant subsequently acknowledged that both had pledged their interest when drafting the September 1, 2006 Side Letter Agreements and November 7, 2006 letter. Thus, the Defendant's conduct both before and immediately after the loan closing provides no evidence of intent to defraud. It was only three years later, after the failure of American Gear and the liquidation of the purchased property, and after the Defendant and his wife filed for bankruptcy relief, that they as chapter 11 debtors in possession raised the legitimate question of the extent of the Plaintiffs' security interests, since Ms. Dickens had not signed the security agreements. To conclude based solely on this challenge and on the original innocent misstatement of ownership that the Defendant had intended all along to dispute the Plaintiffs' secured status, that he had never intended to keep his promise to protect and defend the Plaintiffs' security interests, and that he had falsely made the representation at the time of the loan with the intent to later disavow is so improbable a claim that it must be rejected.

Moreover, although not set forth in a statement of undisputed material facts, submitted in connection with the pending summary judgment motions is the Defendant's declaration in which he states that "[o]n May 16, 2006, I had no intent of ever challenging the 100% lien claim or rights in the stock of Keisler Engineering, Inc. being granted to Mission Compound, LLC, Courmont & Wapner Associates, Dr. R. Glenn Hall, John Bracken or Jordan E. Glazov." The Defendant also states in the declaration that the financial package he prepared for Mr. Glazov and Marco Polo Securities to use in finding lenders included the three most current joint federal income tax returns of the Defendant and his wife, a Keisler Engineering tax return, and a March 2006 joint personal financial statement, all of which listed the Keisler Engineering stock as being jointly owned by the

18

Defendant and his wife. While the record provides no evidence as to whether these documents were ever provided to the Plaintiffs, they do provide further support for the proposition that the Defendant was forthright in his dealings with the Plaintiffs, and had no fraudulent intent at the time the loans in question were made.[8]

IV.

Federal Rule of Civil Procedure 56(a), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that "[a] party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought" and that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The initial burden to demonstrate the absence of a genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Upon making this showing, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986). Both parties must support

---

[8] In light of the court's ruling, it is unnecessary for the court to address the Defendant's alternative argument, that res judicata bars the Plaintiffs' nondischargeability claim because they were required to raise the claim in the earlier adversary proceeding. In any event, the Defendant is wrong on this point. For res judicata to apply, the following elements must be present:

(1) a final decision on the merits by a court of competent jurisdiction;

(2) a subsequent action between the same parties or their privies;

(3) an issue in the subsequent action which was litigated or should have been litigated in the prior action; and

(4) an identity of the causes of action.

*Browning v. Levy*, 283 F.3d 761, 772 (6th Cir. 2002) (internal quotation marks omitted). As argued by the Plaintiffs, dischargeability could not have been litigated in the § 506 Adversary Proceeding because the deadline for filing a dischargeability complaint in Defendant's chapter 11 case was December 29, 2008, *see* Fed. R. Bankr. P. 4007, and Defendant filed the § 506 Adversary Proceeding approximately five months after that deadline had passed, on June 11, 2009. It was only upon conversion to chapter 7 on January 16, 2014, that a new time period for filing a complaint to determine dischargeability of a debt commenced. *See* Fed. R. Bankr. P. 1019.

19

their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

When deciding a motion for summary judgment, the court may not weigh the evidence to determine the truth of the matter asserted but must simply determine whether a genuine dispute for trial exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). The facts and all resulting inferences are to be viewed in the light most favorable to the non-moving party, and the court must decide whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251-52. "Summary judgment in favor of the party with the burden of persuasion is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553, 119 S. Ct. 1545 (1999)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (citations omitted).

This court's prior ruling in the § 506 Adversary Proceeding precludes the Plaintiffs from claiming their damages were proximately caused by the Defendant's alleged misrepresentations. Further, the record is devoid of any evidence of deceit, trickery, or an intention by the Defendant to cheat or defraud the Plaintiffs. Reduced to its essential facts, this case simply involves an innocent misstatement of ownership that was not fatal and a broken pledge to protect and defend security interests three years after the fact. Neither the misstatement nor the broken pledge, whether considered singularly or collectively with  the other evidence in this case, comes close to constituting fraud. Drawing all reasonable inferences from the undisputed facts in favor of the Plaintiffs, the evidence remains so one-sided in favor of the Defendant that he must prevail as a

20

matter of law.   Accordingly, an order will be entered granting Defendant's summary judgment

motion and denying that of the Plaintiffs.

# # #